## Ringo *vs* Stewart.

Error to the Fleming Circuit.

*Common Schools. Districts and Taxes.*

Trespass.

*Case* 41.

*October* 13.

Case stated.

Judge Marshall delivered the opinion of the Court.

This action of trespass was brought by Stewart to test the authority of Ringo, as collector of the 11th School District in Fleming county, to distrain for the tax assessed upon the inhabitants of that district, at a meeting held therein on the 6th of November, 1840, at which meeting the school system provided by the act of February, 1838, (3 *Stat. Law*, 528,) was adopted by a majority of the voters present; a tax was assessed and officers elected.

The case of *Chiles* vs *Todd*, at the present term, decides in what manner these preliminary meetings may be called and held, so as to make the vote for adopting the school system, and the other proceedings authorized by the act, effectually binding upon the inhabitants of the district, and we need only say upon that subject, that so far as those points merely are involved, the validity of the proceeding in this case is sustained by the decision referred to. But there is, in this case, a more radical and fundamental objection than that which questions the manner in which the preliminary meeting was called and held. The existence itself of the 11th District, in any such form as would authorize a meeting, called by any general notice, to bind those who were not present, is denied, and as we think successfully.

The report of the division of counties into school districts should be filed for record with the County Ct. Clerk, as required by the statute, otherwise the organization is incomplete and no authority is conferred on Trustees to enforce

The 8th section of the act provides, that the County Courts shall direct the Surveyors of their respective counties, with other competent persons, to divide their respective counties into a convenient number of School Districts, and to return a report of the same, with necessary explanations, to the Clerks of their respective Courts, on or before the first day of September following, whose duty it shall be to record the same, &c. &c. It appears that at the June term, 1838, the County Court of Fleming directed the Surveyor of the county and five others

named in the order, to divide the county into districts, as prescribed; and that a report, signed by three, of whom the surveyor was one, was returned to the Clerk's office on the first of September following; but the Clerk, some short time after, died, and the report was not recorded until 1841; and it further appears, that on application at the office, before the meeting of the 6th of November, by a person alledged to be within the 11th District, there was no report nor record or copy of it there, and he could not even find it by inquiry from the School Commissioners, who had taken it out, and it does not appear to have been in the office at any time between the date of the notice calling the meeting on the 6th of November, and the day on which the meeting was held. Now, as the first meeting to be called was to exercise the important function of determining whether the system should be adopted, whereby, if the proceedings were regular, all the inhabitants and property of the district would become bound to the payment of such taxes as might then and afterwards be assessed at the regular meetings of the district, it was obviously necessary, in point of justice and in obedience to the principles on which our institutions are founded, that all persons liable to be thus affected by the introduction of this new power, should have a full and fair opportunity of participating in the meeting, by whose vote it was either to be rejected or received, established and regulated. It was for the purpose of giving this opportunity, that the act requires, not only that public notice of the time and place of the meeting shall be given, but that the report, showing the division of the county into districts, should be recorded. It would have been a mockery to the right of the citizens to require, as the act does, notice by advertisement of the meeting, by whose votes they were to be affected, unless all persons to be bound thereby had the means of knowing what the district was, and to whom the notice was addressed: and it was to furnish the means of knowing this, that the law required that the report of the division of the county into districts should be returned to the Clerk and recorded in his office, where, being accessible to all, it would furnish to each the means of knowing to what district he belonged, and a

fair opportunity of guarding his rights.   The recording of the division into districts, or at least its being lodged and remaining in the office, subject at all times to the inspection of those who were interested in the subject was, together with the publication, the regular means appointed by law for giving to each individual the information requisite for enabling him to participate, as he would have a right to do, in a measure which was to subject himself and his property to the exigences of a new authority; and we can but regard every part of these appointed means as essential to the lawful introduction and establishment of that new authority.   If under any circumstances of accidental loss or destruction of the report before it was recorded, the want of the opportunity appointed by law for ascertaining the boundaries of the respective districts could be supplied otherwise than by a new report, we are satisfied that this could be done by nothing less than a personal notice from the Commissioners to each individual in the district, who had a right to vote in the meeting; and the efficacy even of such a notice may be doubtful, since it might not have been accompanied by, nor carried with it, as the law then stood, sufficient evidence that the persons addressed were within the district whose meeting they were required to attend.   In this case, however, there was no attempt to supply, by actual notice, the means of knowledge which the inhabitants of the district were entitled to.   The notice was a general one, posted up in different places, but neither served upon individuals nor containing the names of those to whom it was addressed.

A still more radical objection is, that the report itself, had it been recorded or had it remained in the office, would not, as it appears in this record, have given the information which it was designed to convey, with regard to the boundaries of the several districts or the persons residing within them.   The report, as to the 11th District, seems to consist merely of a list of seventeen names, with the number of children between seven and seventeen years of age, annexed to each, under the title of the 11th District, and accompanied by a short statement, applicable to all the districts, importing that the

Such report should designate the boundaries with such certainty, by actual survey or otherwise, as to show who were entitled to vote in the adoption of the system.

names of those "settlers" only who have children are set down, and that on the outside leaf, there is a plan of the county, drawn by observation, showing the position in which the several districts lie. This plan, however, is not incorporated into the present record, but it is to be inferred from what is said in the report, and more certainly from the evidence of the Commissioner who made it out, that it is a mere picture of the county and the several districts laid down, without ever going upon the ground, and referring to no objects, natural or artificial, by which the boundaries of the district can be ascertained. It appears certainly, from the report itself, that the list of names in the 11th District does not contain the names of all the persons who lived within that district, as intended to be located; and it appears still more certainly, from the proceedings of the meeting, and the names contained in the warrant for collecting the tax, that there were many persons held bound by the proceedings, whose names were not contained in the list which was intended to describe the district. The report itself, therefore, must as the case now appears, be regarded as fatally defective in not showing, except to the extent of the names contained in it, what the 11th District was, or who were its inhabitants; and whether there was an actual survey or not, the report should have been reasonably certain on one or the other of these points.

We are not to be understood as deciding that there must be an actual survey in order to designate the districts, nor that the mere temporary withdrawal of the report from the office, before it was recorded, and before the preliminary meeting, would have been fatal. But upon the facts which have been stated and for the reasons given, we think there was a substantial defect in the very foundation of these proceedings, in the fact that the inhabitants of the 11th District had no means of knowing what that district was, and who were its inhabitants; and we are of opinion that in consequence of this defect, these proceedings were not authoritative under the law; that consequently, the system was not legally adopted, nor the authority of assessing and collecting taxes acquired by the district, and therefore, that the assessment of

MARMADUKE &c.
vs
TENNANT'S H's.

the tax and the appointment of Ringo as Collector, even if it had been properly carried out by his executing bond, and the warrant given to him as authority for collecting the tax, even if it had been signed by persons shown to have been Trustees, and had been accompanied by a proper tax list annexed to it, showing the property on which the tax was charged, were wholly ineffectual to justify the seizure of the plaintiffs property for the tax which he was called on to pay.

Wherefore, the judgment for the plaintiff is affirmed.

*Boyd* for plaintiff: *Payne & Waller and Cavan & Cox* for defendant.

---

EJECTMENT.

Case 42.

October 13.

## Marmaduke, &c. *vs* Tennant's Heirs.

APPEAL FROM THE GENERAL COURT.

*Ejectment. Amendments. Division of Lands. Sale of land under execution. Judgment.*

JUDGE BRECK delivered the opinion of the Court.

UPON the demise of sundry persons, claiming to be the heirs of John Tennant, deceased, a judgment in ejectment was recovered against the appellants, from which they have appealed to this Court.

The facts and law of the case, as ruled by the Court, are presented in bills of exceptions.

Previous to the trial the Court permitted the plaintiff, on motion, to amend his declaration by striking out one hundred and ninety-five and inserting two thousand acres, to which the defendants objected. The propriety of permitting this amendment is the first question we shall notice.

The practice of permitting the demise in declarations of ejectment to be amended has long been indulged. Numerous cases are found in the English authorities where the plaintiff has been permitted to add a new demise long after the institution of his suit, and even to amend the demise after judgment. Nonsuits, resulting from a mistake in the demise, have been set aside, and the plain-

tiff, by amendment, permitted to correct the mistake. Similar indulgence has also been extended by the judiciary of New York. In 1st Caines, 251, the plaintiff was permitted to add a new demise, six years after the service of the declaration.

This Court has sanctioned the practice of permitting the demise, before trial, to be amended by extending it and changing its date, but we are aware of no case in which an amendment as to the quantity, boundary or description of the land has been indulged. All amendments must depend upon the exercise of a sound discretion by the Court, and must be made upon such terms and conditions as it may be just and reasonable to impose. It is not, we think, to be deprecated that Courts at law have manifested an increasing liberality in allowing amendments to obviate technical objections and to secure a fair trial upon the merits. But the amendment in this case is not in reference to the mode or form of proceeding, but is one of substance. It enables the plaintiff to include in the contest more land than he originally sued for; and we should not be inclined to indulge amendments of the kind, except upon such terms as a just regard to the rights of defendants might require. But as it is apparent that the amendment in question did no injustice to the defendants, nor operate to their prejudice, we are not prepared to say that there was any abuse of discretion by the Court in permitting it, and consequently we are of opinion, that it is no cause for disturbing the judgment.

Among other documentary testimony introduced by the defendants upon the trial, were two deeds for one hundred and ninety acres of the land in controversy; one of the deeds made by the late, the other by the present United States Marshal for the district of Kentucky, and both deeds made in virtue of the same sale.

They also introduced a report, made by Commissioners appointed by the County Court of Oldham, under the act of 1792, for the divison of lands held by citizens of Kentucky and non-residents in conjunction, of the division of a tract of land of which the tract in controversy

**Margin notes:**

MARMADUKE &c.
*vs*
TENNANT'S H's.

It was no abuse of the discretion of the Circuit Court to permit the plaintiff to amend his demise, by striking out one number of acres and inserting a greater, *as no injury resulted* to the defendant therefrom.

A sale of 190 acres, part of a tract of 600, by an officer under execution, without other designation, is void for uncertainty.

was part, between one William D. White and a part of, the lessors of the plaintiff.

The Court instructed the jury, that neither the deeds nor the County Court division furnished any obstacle to the plaintiff's recovery. The correctness of that instruction is questioned by the counsel of the appellants, and will be now considered.

The sale was made by the Marshal in 1825, in virtue of sundry executions, which were issued by the Clerk of the District Court of the United States for Kentucky, against all the lessors of the plaintiff in this case, as the heirs and representatives of John Tennant, deceased. The executions had been levied upon a tract of six hundred acres, in the county of Oldham, as the land of the defendants, and which included all the land in controversy in this suit. The Marshal returns that Lawrence Young undertook and agreed to pay off the whole amount of all the executions, for 190 acres of said land, and no person offering to pay the same for a less number of acres, it was stricken off to said Young. Presuming that the Marshal had authority to levy and sell lands under execution, in the mode pointed out by the statutes of Kentucky, the question arises whether the sale in question was so made. The third section of the statute of 1798, authorizing and prescribing the mode of selling lands under execution, and which was in force when this sale was made, authorized the officer, if there were no goods, chattels or slaves, of which to make the debt, "lastly to sell the lands, tenements and hereditaments in possession, reversion or remainder, or so much thereof, in one or more entire parcels, as shall be sufficient, and such parts as the owner shall direct, if he thinks proper:" (1 Littell and Swigert's Digest, 513–14.) The Marshal in this case sold 190 acres of the 600, but without designating how or where it was to be laid off. It was an undivided 190 acres, in the tract of 600. Neither the Marshal nor the purchaser, after the sale, had any right or authority to locate it. Such a sale was not, we think, authorized by law. The statute is express in requiring it to be "laid off in one or more entire parcels," and authorizes a sale in no other way. This Court has always

*Margin notes:*

MARMADUKE &c. *vs* TENNANT'S H's.

A division of land by County Court Commissioners must, to be binding, appear to have been made at the instance of and between those who were interested, and not of part of a tract only.

The judgment in
ejectment should
conform to the
verdict of the ju-
ry.